2016 BNH 004

_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                    Bk. No. 11-10763-JMD
                                                          Chapter 7

Raymond E. Ladebush and
Karen A. Ladebush,
            Debtors

Raymond E. Ladebush and
Karen A. Ladebush,
            Plaintiffs

v.                                                        Adv. No. 13-1154-JMD

Beneficial New Hampshire, Inc.
and HSBC Mortgage Corp.,
            Defendants

*Kristina Cerniauskaite, Esq.*          *Kate Strickland, Esq.*
*Terrie Harman, Esq.*                   *Downs Rachlin Martin, PLLC*
*Harman Law Offices*                    *Lebanon, NH*
*Portsmouth, NH*                        *Attorney for the Defendants*
*Attorneys for the Plaintiff*

## MEMORANDUM OPINION

## I. INTRODUCTION

The matter before the Court is the adversary complaint (Doc. No. 1) filed by the plaintiffs Raymond E. Ladebush and Karen A. Ladebush (collectively, the "Debtors") against Beneficial New Hampshire, Inc. ("Beneficial") and HSBC Mortgage Corp. ("HSBC," collectively with Beneficial, the "Defendants") asserting violations of the discharge injunction.  The Court conducted a one day trial on August 6, 2015, at which the Debtors and Dana Jean St. Clair-

Hougham ("Ms. Hougham"), an HSBC Manager of Operations for Litigation Support, testified and sixty-six exhibits were introduced into evidence. For the reasons set forth below, the Court will enter judgment in favor of the Defendants.


## II. JURISDICTION

This Court has authority to exercise jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 157(a), 1334, and U.S. District Court for the District of New Hampshire Local Rule 77.4(a). This is a core proceeding under 28 U.S.C. § 157(b).


## III. FACTS

The facts are largely undisputed. The Debtors reside on real property located at 32 Columbus Avenue in Dover, New Hampshire (the "Property"). On February 9, 2006, the Debtors executed a Loan Agreement with Beneficial Mortgage Company of New Hampshire in the original principal amount of $472,874.17 and granted a first mortgage on the Property to Beneficial Mortgage Company of New Hampshire to secure the obligation. Beneficial is an affiliate of HSBC and the successor by merger to Beneficial Mortgage Company of New Hampshire.

The Debtors filed a voluntary Chapter 7 petition on March 1, 2011. On Schedule A—Real Property, the Debtors listed an ownership interest the Property as having a value of $339,467.00. On Schedule D—Creditors Holding Secured Claims, the Debtors listed "Beneficial/HFC" as holding a mortgage on the Property securing an obligation in the amount of $490,757.00. On their Chapter 7 Statement of Intention, the Debtors indicated that they intended to retain the Property.

2

On April 19, 2011, the Debtors appeared at a meeting of creditors held pursuant to 11 U.S.C. § 341(a).  On April 22, 2011, the Chapter 7 trustee filed the Chapter 7 Trustee's Report of No Distribution, indicating the absence of non-exempt property available for distribution to the Debtors' creditors.   A discharge entered on September 1, 2011, of which Beneficial does not dispute that it received notice.

The Debtors did not reaffirm their debt to Beneficial.  During their bankruptcy case, the Debtors, through their counsel, attorney Christopher W. Keenan ("Attorney Keenan"), attempted to negotiate a reaffirmation agreement, but were unable to come to terms in light of Beneficial's refusal to reduce the outstanding obligation, which at that time was over $500,000.00, to the value of the Property, which was approximately $339,467.00.[1]   In pursuing this relief, it is apparent that the Debtors intended to contest Beneficial's ability to foreclose in the event that they were not able to obtain such a reduction.[2]   Indeed, in a letter dated May 4, 2011, Attorney Keenan, in addition to discussing the terms of a possible reaffirmation agreement, emphasized the Debtors' insistence on examining the original loan documents, noting that Beneficial had been identified as one of several lenders who have had difficulty locating original loan documents, and threatening to obtain a temporary restraining order to stop any foreclosure until they were produced.[3]

Upon exiting bankruptcy, the Debtors began receiving automated account statements from Beneficial.  Over time, these statements came in several different forms.  The two initial statements, dated October 28, 2011, and November 26, 2011, respectively (the "Initial

---

[1] Ex. 117.

[2] Id.

[3] Id.

Statements"), advised the Debtors of the amount necessary to bring their loan current.  The first page of these statements contain the phrases "payment due" and "payment due date" in at least three places each, and include payment coupons for the arrearage.[4]    Additionally, page two of the statements, under the heading "Account Notices," warns: "Your account is now seriously overdue.  We expect you to pay the past due amount immediately."[5]    Notwithstanding these demands, the back of the first page contains the following disclaimer in smaller print: "**PAYMENT INFORMATION**:  This language does not apply to any customer whose account was involved in a Chapter 7 bankruptcy and the account was discharged."[6]

On or about October 11, 2011, Beneficial sent the Debtors and Attorney Keenan a letter inviting the Debtors to apply for Beneficial's Foreclosure Avoidance Program (the "FAP").[7]  The letter states in relevant part:

> Your client filed Chapter 7 bankruptcy and did not reaffirm their loan with Beneficial.  However, your client has indicated a desire to stay in the property.  Since we retain a security interest in the property, we have not exercised our right to foreclose based on your client's intent to make voluntary payments.  Unfortunately, your client has not made any voluntary payments recently. . . .  Depending on your client's situation, we may be able to provide hardship relief.
>
> If your client chooses to work with us, we will work with you on behalf of your client to return their loan to current status.  This program does not seek to reinstate your client's personal liability for the discharged obligation, nor is this an attempt to collect a debt.  If your client qualifies for this program, we will help resume voluntary payments by reducing the interest rate of the loan.[8]

---

[4] See Exs. 4, 5.

[5] Id.

[6] Id.

[7] Ex. 22.

[8] Id.

4

The letter further informed the Debtors that they would need to submit certain documentation to establish their monthly income and expenses as part of the application process.[9]   Attorney Keenan submitted the requested documentation enclosed with a letter dated November 18, 2011.[10]   Notably, Attorney Keenan's letter again referenced the Debtors' desire to review the original loan documents and their belief that Beneficial could not foreclose:

> Prior to having any discussions concerning hardship relief, please be advised that as previously requested by myself on behalf of my clients, [sic] would like the opportunity to review the original loan documentation associated with the Ladebush Note and Mortgage concerning 32 Columbus Avenue, Dover, New Hampshire.   While I certainly am not requesting that the original loan documentation be forwarded to myself or my client, we would need to have it made available at a mutually agreeable location in order that myself and my clients may view the original loan documentation which would be required before Beneficial may exercise any of its' [sic] foreclosure rights. . . .[11]

According to Beneficial's account records, which were admitted into evidence at trial, the Debtors' request for hardship relief was denied on November 28, 2011, because the account had exceeded the allowed number of modifications.[12]   Due to an apparent error, however, Beneficial never informed the Debtors, as would have been the standard practice according to Ms. Hougham.   At trial, the Debtors testified that neither they, nor their attorney, ever inquired as to the status of their request until June, 2012.   On February 23, 2012, the FAP expired because the account had not been brought current.[13]   In the interim, Beneficial continued to monitor the account for voluntary payments.

---

[9] Id.

[10] Ex. 23.

[11] Id.

[12] Ex. 31 at 387.

[13] Id. at 375.

At trial, the Debtors gave inconsistent testimony regarding their post-discharge intentions toward the Property.  For example, Mrs. Ladebush repeatedly insisted that the Debtors never informed Beneficial that they wanted to keep or stay in the Property post-bankruptcy, but it is undisputed that the Debtors applied for the FAP.  Ultimately, Mrs. Ladebush conceded that their goal was to obtain a loan modification that would permit them to remain in the Property.  Indeed, Mr. Ladebush testified that they never even considered moving out of the Property because they were trying to work out a deal.  As of the date of trial, the Debtors have continued to reside at the Property.

Similarly, the Debtors each testified that they expected Beneficial to foreclose in the absence of a reaffirmation agreement.  However, Mr. Ladebush later clarified that while they expected Beneficial to try to foreclose, the Debtors intended to file suit to stop any foreclosure, by challenging the underlying security interest, and force Beneficial back to the negotiating table.  In contrast, Mrs. Ladebush denied that they had always intended to fight the foreclosure, but admitted their plan was to get an attorney and "let him deal with it."  She did not elaborate further on what that meant.

Between December, 2011, and December, 2012, the format of the statements changed dramatically from that of the Initial Statements (the "Informational Statements").[14]  Each statement contained a bold label at the top indicating that it was an "Informational Statement."[15]  The "payment due" language used in the Initial Statements was replaced with references to "voluntary payment to keep the mortgage current," and the payment coupons became

---

[14] See Exs. 7-18.

[15] Id.

"voluntary" payment coupons.[16]  Each statement also now contained a conspicuous disclaimer "block" on the first page encasing the following language in bold print:

> This informational statement is NOT an attempt to collect any debt from you, as you have obtained a discharge of personal liability [sic] bankruptcy.  You are not personally liable to make any payment on your mortgage loan, and any payment you may make is voluntary.
>
> However, we retain a mortgage lien on the property located at 32 COLUMBUS AVE.  You have informed us that you intend to keep your mortgage current and you have asked that we send you this statement to show the remaining balance against the property, to provide a receipt of previous voluntary payments made and/or to indicate the next voluntary payment to keep the mortgage current.[17]

The Informational Statements also included the same back page fine print disclaimer that appeared in the Initial Statements.  At trial, Ms. Hougham testified that the format change was a result of Beneficial having adopted new standard forms for 2012.

The Debtors never made any voluntary payments to Beneficial.  Mrs. Ladebush explained that she thought making payments without a loan modification in place would amount to throwing money away if Beneficial foreclosed, particularly as they lacked sufficient resources to bring the loan current.  She further testified that she felt Beneficial was bullying them into paying by sending the statements.  The Debtors simply forwarded each statement to Attorney Keenan.  Notwithstanding her testimony about feeling bullied, the Debtors never asked Beneficial to stop sending them statements, and there is no evidence in the record establishing that Attorney Keenan made such a request on their behalf.

Due to the delinquent status of the loan, Beneficial commenced monthly property inspections in 2010, which continued post-discharge.  The inspections were conducted on a

---

[16] Id.

[17] Id.

"drive-by" basis whereby the inspectors would park on the public street, observe the Property for a time, and take a photograph.  Ms. Hougham testified that the purpose of the inspections was to verify occupancy and assess the condition and security of the Property.  She further testified that the inspectors are instructed not engage the homeowner during these inspections.

The Debtors were aware Beneficial had the right to conduct property inspections, and, apparently, the inspections did not go unnoticed.  At trial, the Debtors testified that they observed unmarked pickup trucks parked outside their home and sometimes saw individuals taking pictures.  Mrs. Ladebush testified that this happened a dozen times, though Mr. Ladebush clarified that each occurrence was about three to four weeks apart. The Debtors tried to approach the trucks on several occasions, but the trucks always drove off without any contact.

While the Debtors testified that they felt terrorized by the property inspections, allegedly giving rise to anxiety and emotional distress, their assertions were undercut by their own testimony.  In the first instance, the Debtors concede that it is impossible to know whether every truck they observed was, in fact, conducting a property inspection for Beneficial.  Moreover, the Debtors cited the uncertainty surrounding the identity of these trucks as stress inducing, particularly in light of their safety concerns for their teenage children, but at trial, they testified that they were sure that the trucks could only have been property inspectors from Beneficial. Notably, the Debtors never asked Beneficial to cease the property inspections.

On June 8, 2012, a representative of Beneficial arrived at the Property around 10:00 or 11:00 a.m., rang the doorbell, and handed Mrs. Ladebush a "door tag" after confirming the address of the Property.[18]   The door tag stated in large bold print, in English and Spanish,

---

[18] Ex. 20.

"IMPORTANT . . . PLEASE CALL . . . Mortgage [illegible]" and provided a 1-800 number.[19] Although the individual refused to identify himself before leaving, it was apparent that he represented Beneficial.  Ms. Hougham testified that leaving notes at the door was standard practice prior to March, 2013, to re-initiate contact with homeowners when there was a serious delinquency and no ongoing discussions.

At trial, Mr. Ladebush insisted that the property inspections would have been less intrusive and stressful had the inspectors come to the door and identified themselves.  Ironically, however, Mrs. Ladebush testified that she was very distressed by the Beneficial representative coming to the door, even though he did not make any threats.  She explained that she became worried about people showing up at the house, resulting in anxiety, lack of sleep, and marital issues.  Mrs. Ladebush denied the possibility that any of her stress was related to the bankruptcy or impending foreclosure.

After receiving the door tag, Mrs. Ladebush called the listed number and learned for the first time that their loan modification request had been denied back in November, 2011.[20] Between June 8, 2012, and June 11, 2012, she spoke to various representatives who all requested that she either make a voluntary payment in the amount of $138,290.85 to bring the account current, or execute a deed-in-lieu of foreclosure or agree to a short sale.[21]  Mrs. Ladebush referred the representatives to Attorney Keenan, insisting that she would not make any payments until a deal was in place.[22]

---

[19] Id.

[20] Ex. 21.

[21] Id.

[22] Id.

On July 12, 2012, Beneficial sent the Debtors a notice informing them that their account was seriously delinquent and had been referred to counsel to begin foreclosure proceedings.[23] This was followed by a letter dated August 6, 2012, from Harmon Law Offices, P.C. ("Harmon") advising the Debtors that their default had triggered an acceleration in the note and that a total of $646,982.91 was due and owing, and that Beneficial would proceed to foreclosure if the default was not cured.[24]  By letter dated August 14, 2012, Harmon provided to each of the Debtors the statutorily mandated notice of foreclosure sale indicating a public auction would take place on September 12, 2012.[25]

Attorney Keenan responded to the notice of foreclosure by letter to Harmon dated August 22, 2012, again demanding to review the original loan documentation, failing which, he would file a petition in the Rockingham County Superior Court (the "Superior Court") seeking to permanently enjoin the foreclosure on or before September 6, 2012.  The foreclosure scheduled for September 12, 2012, was apparently cancelled while Attorney Keenan attempted to resolve the issues with Harmon.[26]  Ultimately, however, in November, 2012, Harmon informed Attorney Keenan that Beneficial would provide the Debtors copies of the loan documents, but not the originals, and would be proceeding with the foreclosure.[27]  By a letter dated December 6, 2012,

---

[23] Ex. 24.

[24] Ex. 25.

[25] Ex. 26.

[26] See Ex. 28.

[27] Ex. 29.

the Debtors each received a new statutory notice of foreclosure sale scheduling a public auction for January 4, 2013.[28]

On January 2, 2013, the Debtors filed their petition for injunctive relief in the Superior Court.[29]  The petition alleged that Beneficial could not foreclose as the successor of Beneficial Mortgage Company of New Hampshire and because Beneficial was not otherwise the holder of the note and mortgage.  The Superior Court litigation remained pending as of the date of trial.

After receiving Informational Statements for a year, the account statements dated January 28, 2013, and February 25, 2013 (the "2013 Statements"), returned to a format similar to the Initial Statements, demanding payment of the full arrearage and warning that the account was now "seriously overdue."[30]  Unlike the Initial Statements, however, the 2013 Statements did not contain any bankruptcy disclaimer.  At trial, Ms. Hougham testified that this change in format was the result of a coding error in the account's status triggered by the onset of litigation.  For his part, Mr. Ladebush testified that he was not distressed by the 2013 Statements because he knew they would not make a payment during the pending litigation.

On November 15, 2013, the Debtors, now represented by Attorney Terrie Harman ("Attorney Harman"), moved to reopen their bankruptcy case for the purpose of filing the present adversary proceeding.  The Court granted the motion on November 26, 2013, and their complaint was filed the same day.  The Defendants filed their answer on December 23, 2013.  After the completion of discovery, the parties filed cross-motions for summary judgment, which the Court denied on April 14, 2015.  The Court conducted a trial on August 6, 2015, and at its

---

[28] Ex. 30.

[29] Ex. 129.

[30] See Exs. 18, 19.

conclusion, took the matter under advisement. The parties each filed post-trial briefs, and Attorney Harman filed a fee affidavit, to which the Defendants objected.

## IV. POSITIONS OF THE PARTIES

A. <u>The Debtors</u>

The Debtors argue that under the totality of the circumstances, the Defendants' acts sought to coerce them into paying a discharged debt and thus, violated the discharge injunction. In particular, they cite three examples of coercive behavior: (1) the transmission of monthly billing statements; (2) the appearance of Beneficial's representatives at their home without warning; and (3) Beneficial's "demands" for voluntary payment during telephone conversations with Mrs. Ladebush in June, 2012.  The Debtors also contend that Beneficial solicited them to apply for a loan modification knowing they were ineligible and withheld notice of its denial so that the Debtors would be bullied into making additional payments before Beneficial ultimately foreclosed.

The Debtors assert that the Defendants cannot rely on the safe harbor provisions of 11 U.S.C. § 524(j), which outlines permitted creditor activity post-discharge, for several reasons. First, they argue that billing statements, which they stress they never requested, without a bankruptcy disclaimer is clearly a demand for payment.  Second, the Debtors posit that, by its express terms, 11 U.S.C. § 524(j) applies only to "periodic payments" and does not insulate Beneficial's requests that the Debtors pay an amount necessary to bring the account current.  Third, they urge that once the Defendants commenced foreclosure proceedings, any request for payment was no longer "in lieu of . . . in rem relief," and violated the discharge injunction.

In sum, the Debtors assert that they have suffered emotional distress due to these acts and are entitled to their actual damages.  Additionally, they request attorney's fees and costs in the amount of $38,850.01.

### B. The Defendants

The primary thrust of the Defendants' position is that a bankruptcy discharge does not extinguish their mortgage and 11 U.S.C. § 524(j) permits a secured creditor to perform acts in the ordinary course of business to seek voluntary payments from debtors in lieu of exercising their right to foreclose.  They rely on Ms. Hougham's unrebutted testimony to establish that all acts complained of were done in the ordinary course of business with the Debtors.  In further support, the Defendants point to bankruptcy disclaimers on the account statements as evidence that they were not seeking to collect a debt, but merely informing the Debtors of the voluntary payment necessary to bring the account current.  Notably, the Defendants cite Manning v. CitiMortgage, Inc. (In re Manning), 505 B.R. 383, 387 (Bankr. D.N.H. 2014), for the proposition that a request that the mortgagee bring the account current falls within the safe harbor of 11 U.S.C. § 524(j).

## V. DISCUSSION

In a Chapter 7 case, unless a party in interest timely objects, "the court shall grant the debtor a discharge."  11 U.S.C. § 727(a).  Generally speaking, "a discharge under [§ 727(a)] discharges the debtor from all debts that arose before the date of the order for relief under [Chapter 7]."  11 U.S.C. § 727(b).  The discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect,

13

recover or offset [a discharged debt] as a personal liability of the debtor . . ."   11 U.S.C. § 524(a)(2).  The purpose of the discharge injunction is to afford "honest but unfortunate debtors with a 'fresh start' from the burdens of personal liability for unsecured prepetition debts and thus advances the overarching purpose of the Bankruptcy Code."  Canning v. Beneficial of Maine, Inc. (In re Canning), 706 F.3d 64, 69 (1st Cir. 2013).  See Pratt v. Gen. Motors Acceptance Corp. (In re Pratt), 462 F.3d 14, 17-18 (1st Cir. 2006).  The Court may enforce the discharge injunction and redress violations pursuant to its "statutory contempt powers" under 11 U.S.C. § 105(a), which "inherently include the ability to sanction a party."  Ameriquest Mortgage Co. v. Nosek (In re Nosek), 544 F.3d 34, 43-44 (1st Cir. 2008).  See In re Canning, 706 F.3d at 69; In re Pratt, 462 F.3d at 17; U.S. v. Rivera Torres (In re Rivera Torres), 432 F.3d 20, 23 (1st Cir. 2005).

"In assessing violations of the . . . discharge injunction, the core issue is whether the creditor acted in such a way as to 'coerce' or 'harass' the debtor improperly."  In re Pratt, 462 F.3d at 19.  Indeed, "even legitimate state-law rights exercised in a coercive manner might [violate] the discharge injunction."  Id.  See In re Canning, 706 F.3d at 73; Paul v. Inglehart (In re Paul), 534 F.3d 1303, 1308 (10th Cir. 2008).  Therefore, "[c]oercion is assessed under an objective standard[] and . . . determined on the specific facts of each case."  Bates v. CitiMortgage, Inc. (In re Bates), 517 B.R. 395, 398 (Bankr. D.N.H. 2014), aff'd, 2016 DNH 026 (D.N.H. Feb. 10, 2016) (citing In re Pratt, 462 F.3d at 19).  Ultimately, the debtor must prove, by clear and convincing evidence, that the creditor, with knowledge of the discharge order, engaged in acts that were improperly coercive under the totality of the circumstances.  See In re Best, 540 B.R. at 9; In re Manning, 505 B.R. at 386.

Nevertheless, a Chapter 7 "discharge extinguishes only 'the personal liability of the debtor' . . . . [and] the Code provides that a creditor's right to foreclose on a mortgage survives

or passes through the bankruptcy."  <u>Johnson v. Home State Bank</u>, 501 U.S. 78, 83 (1991) (emphasis in original).  <u>See</u> <u>also</u> <u>Farrey v. Sanderfoot</u>, 500 U.S. 291, 297 (1991) ("[o]rdinarily, liens and other secured interests survive bankruptcy.").  "Thus, from a legal standpoint, the debt remains technically in existence, and may be enforced against the collateral by those creditors with security interests unaffected by bankruptcy."  <u>In re Zine</u>, 521 B.R. 31, 39 (Bankr. D. Mass. 2014).  From a practical standpoint, this means that if the debtor-mortgagee desires to stay in their mortgaged home, they will have to make voluntary payments to the mortgagor.  To this end, 11 U.S.C. § 524(j) affords certain secured creditors a safe harbor from the discharge injunction so long as the creditor's acts are in the ordinary course of business and limited to seeking payments in lieu of in rem relief.  <u>See</u> <u>Best v. Nationstar Mortgage LLC (In re Best)</u>, 540 B.R. 1, 9 (B.A.P. 1st Cir. 2015); <u>Lemieux v. America's Serv. Co. (In re Lemieux)</u>, 520 B.R. 361, 368 (Bankr. D. Mass. 2014).  Specifically, 11 U.S.C. § 524(j) provides:

> Subsection (a)(2) does not operate as an injunction against an act by a creditor that is the holder of a secured claim, if—
>
> > (1) such creditor retains a security interest in real property that is the principal residence of the debtor;
> >
> > (2) such act is in the ordinary course of business between the creditor and the debtor; and
> >
> > (3) such act is limited to seeking or obtaining periodic payments associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien.

11 U.S.C. § 524(j).  Notably, the requirements are conjunctive, meaning that all must be satisfied for the exception to apply.  <u>In re Best</u>, 540 B.R. at 10.

15

In the present case, there is no dispute that the Defendants hold a secured claim with respect to the Property.[31] Nor is it contested that the Property is the Debtors' primary residence. Accordingly, the only remaining issues are whether the Defendants' acts were: (1) in the ordinary course of business between the creditor and the debtor; (2) limited to seeking periodic payments; (3) in lieu of pursuit of in rem relief to enforce the lien; and (4) not improperly coercive under the totality of the circumstances.

A. In Ordinary Course of Business

At trial, Ms. Hougham testified at length regarding the Defendants' standard practices conducted in the ordinary course of business between Beneficial and mortgagees. She explained that the account statements are automatically generated based on standard forms. All but two of those account statements contained bankruptcy disclaimers, and the vast majority were labeled Informational Statements and merely informed the Debtors of the voluntary payment necessary to bring the mortgage current. Ms. Hougham admitted that the 2013 Statements, which lack any bankruptcy disclaimers and demand payment, were generated as a result of a coding error due to the commencement of litigation by the Debtors. Although the 2013 Statements deviated from the standard format used for mortgagees that have received a discharge, the Court finds that act of sending account statements was itself within the ordinary course of business.

The same is true of the property inspections and the "door knock" visit. Ms. Hougham testified that monthly property inspections are triggered by the delinquent status of the loan.

---

[31] Although the Debtors challenged Beneficial's status as the holder of the mortgage in the state court proceeding, at the commencement of the trial the Court granted the Defendants' motion in limine to prevent the Debtors from litigating the issue here based on their failure to raise it timely.

While the Debtors object to how Beneficial conducts its inspections, their observations are consistent with Ms. Hougham's testimony regarding the practice. Similarly, Ms. Hougham testified that a "door knock" visit, where a representative hands a note requesting that the mortgagor immediately contact Beneficial regarding a delinquency, was a standard practice prior to 2013 to reinstitute contact with mortgagors who ceased discussions with Beneficial. While there may have been confusion regarding whether the Debtors were, in fact, in contact with Beneficial at the time of the visit due to Beneficial's failure to inform them that their loan modification had been denied, the practice itself was not out of the ordinary.

The final acts the Debtors cite are Beneficial's telephonic "demands" for payment. As the characterization of Beneficial's telephonic communications with the Debtors is more relevant to the remaining issues, for now, the Court will simply note that responding to the Debtors' telephonic inquiries would seem to be the epitome of the ordinary course of business between a creditor and a debtor.

In sum, the Court concludes that the Defendants' acts were all done in the ordinary course of business between the Defendant and the Debtors, thus satisfying the requirement of 11 U.S.C. § 524(j)(2).

B. Limited to Seeking Periodic Payments

By its express terms, 11 U.S.C. § 524(j)(3) permits an act to the extent that it is "limited to seeking or obtaining periodic payments associated with a valid security interest . . . ." 11 U.S.C. § 524(j)(3). The Debtors construe this language technically as permitting only the pursuit of "periodic payments," and posit that a request to bring the account current falls outside the safe

harbor.  The Defendants retort that this Court has previously held that a request that a mortgagor become current falls within 11 U.S.C. § 524(j)(3).  See In re Manning, 505 B.R. at 387.

As a general rule, "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."  Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000) (internal quotation marks omitted).  Although the statute only references "periodic payments," it does not limit them to *regular* "periodic payments."  Thus, factually, a request to become current speaks only to the amount of a particular payment in a series.  Had the Debtors cured the arrearage as requested, periodic payments, as dictated by the applicable documents, would have continued until the obligation was satisfied and the lien discharged.[32]  If the purpose of 11 U.S.C. § 524(j) is to permit debtors and creditors to comes to terms in order to avoid foreclosure, logically, it must allow the creditor to notify a debtor of the amount of any necessary arrearage payment.

Accordingly, Beneficial's requests that the Debtors bring the account current were acts "seeking or obtaining periodic payments associated with a valid security interest . . ." within the meaning of 11 U.S.C. § 524(j)(3).

### C. In Lieu of In Rem Relief

Having concluded that Beneficial sought "periodic payments associated with a valid security interest," the next question is whether its acts were "in lieu of pursuit of in rem relief to enforce the lien."  11 U.S.C. § 524(j)(3).  Again, the Debtors read the statute narrowly,

---

[32] Given the facts of this case, the Court need not address whether a request to bring a fully matured mortgage current in lieu of foreclosure falls within the safe harbor.

contending that "*pursuit* of in rem relief" means that commencement of foreclosure proceedings removes the creditor's subsequent acts from the safe harbor. Notably, the Debtors do not challenge that acts prior to the initiation of foreclosure proceedings were in lieu of in rem relief. Therefore, this argument focuses solely on communications they received after the foreclosure proceedings had been initiated, exclusive of those in connection with the litigation they commenced.

Because Beneficial provided the statutorily mandated foreclosure notices in August, 2012, the only communications at issue are the foreclosure notices themselves, five Informational Statements, and the two 2013 Statements. By their express terms, neither the foreclosure notices nor the Informational Statements sought payment of a debt. Instead, they merely informed the Debtors of the amount necessary to stop the foreclosure. Therefore, it is not relevant to these acts that "pursuit of in rem relief" had begun because they are not acts "seeking . . . periodic payments." The 2013 Statements, however, unequivocally demand payment without any bankruptcy disclaimer, placing them outside the safe harbor of 11 U.S.C. § 524(j). See In re Gill, 529 B.R. 31, 38 (Bankr. W.D.N.Y. 2015); In re Tucker, 526 B.R. 616 (Bankr. W.D. Va. 2015).

### D. Not Improperly Coercive

Although only the 2013 Statements were acts outside the safe harbor of 11 U.S.C. § 524(j), being among the later acts complained of, the totality of the circumstances requires consideration of all the prior activity between the two parties to assess whether they were improperly coercive. Therefore, to place everything in context, it is important to note from the outset that the Debtors applied for the FAP—an act, which viewed objectively, seemingly

19

evidences a desire to stay in the Property and attempt to resolve the arrearage. Their testimony at trial, though not always consistent, confirms that they wanted to remain in the Property. Thus, it was not unreasonable for the Defendants to adopt a posture aiming to avoid foreclosure.

One necessary consequence of the Debtors remaining in the Property without any *in personam* liability is that the Defendants had to be sure the collateral, now the only source of payment on the obligation, was not wasting. Monthly property inspections provided that comfort. While the Debtors may have found the inspections annoying—assuming any of the trucks they observed were, in fact, performing inspections—the Defendants' procedures, which include directives to stay on the public street and not engage the homeowners, appear tailored to be as un-intrusive as possible under the circumstances.

A second consequence of the Debtors staying in the Property was that the arrearage would have to be addressed eventually. To that end, it was only logical for Beneficial to send account statements that informed the Debtors of the voluntary payment necessary to bring the mortgage current. While there are no magic words sufficient to dispel liability under 11 U.S.C. § 524, see, e.g., In re Zine, 521 B.R. at 41 n.64 ("Put simply, fine print that provides that a creditor, who is clearly seeking to collect a debt, should not be viewed as seeking to collect a debt in the event that the creditor is prohibited from doing so is deserving of no weight.") and Curtis v. LaSalle Nat'l Bank (In re Curtis), 322 B.R. 470, 485 n.19 (Bankr. D. Mass. 2005) ("The Court acknowledges, but discounts, the unhighlighted language in the April 15, 2002 letter, which suggests that, in the event of discharge in a Chapter 7 case, no personal liability is asserted. This reservation is of little moment. The lender was continuing to insist that the Debtor make payments on the discharged second mortgage."), the Court finds the manner in which the parties

20

proceeded establishes that the Initial Statements and the Informational Statements can be taken at face value and did not seek to compel the Debtors to pay a discharged debt.

Aside from the 2013 Statements, the record does not reflect that the Defendants ever demanded any payment from the Debtors post-discharge.  Indeed, it appears that once Attorney Keenan responded to the FAP offer letter in November, 2011, there were no communications between parties until June, 2012, when the Beneficial sought to re-establish contact by sending a representative to the Property.  While Beneficial may have requested Mrs. Ladebush voluntarily bring the account current during telephone inquiries, it is apparent that it was simply the final offer to avoid foreclosure.

Given that history, it is unlikely, notwithstanding the express language of the 2013 Statements, that the Defendants intended to coerce the Debtors to pay a discharged debt.  Ms. Hougham testified that this brief format change was simply the result of a coding error brought about by the commencement of the Debtors' state court action against the Defendants.  Even Mr. Ladebush admitted they were not distressed by the 2013 Statements because the litigation was ongoing and they knew they would not make a payment until it was resolved.[33]  Accordingly, the Court finds that the 2013 Statements, like all the prior statements, did not seek to compel payment of a discharged debt.  Considering the totality of the Debtors' admitted legal strategy of attempting to retain the Property at a reduced mortgage balance, their access to legal counsel, and their own testimony on the implementation of their strategy, none of the statements or other contacts with the Defendants were improperly coercive.

---

[33] Even if the 2013 Statements were objectively coercive, Mr. Ladebush conceded they were not distressed by it, and therefore, suffered no damage.

A central premise of the Court's analysis is that the Defendants' posture was reasonably informed by the Debtors' FAP application. Put simply, the Defendants understood that the Debtors wanted to stay in the Property, so they sought payment in lieu of foreclosure. The Debtors, however, challenge this premise by asserting the FAP invitation was an empty, duplicitous gesture because the Defendants allegedly knew, or should have known, that the Debtors were not eligible for another loan modification. In further support, the Debtors point to the fact that the Defendants failed to notify them that the application had been denied until June, 2012. Through this prism, the Debtors contend that Beneficial's pursuit of voluntary payments appears to be an attempt to coerce additional payments on a discharged debt before inevitably foreclosing.

While the facts surrounding the FAP offer and denial are curious, the Court declines to read any nefarious intent into an otherwise straightforward course of conduct. This is particularly the case where neither the Debtors nor their attorney ever inquired as to status of the loan modification, and the Debtors never made any payments post-discharge. Moreover, once the Debtors learned that their application had been denied, they neither asked the Defendants to stop sending them account statements, nor did they invite the Defendants to foreclose.

Accordingly, the Court concludes that the Defendants did not violate the discharge injunction.

## VI. CONCLUSION

For the foregoing reasons, the Court finds the that the Defendants are entitled to judgment as a matter of law. This opinion constitutes the Court's findings of fact and

conclusions of law in accordance with Fed. R. Bankr. P. 7052.  The Court will issue a separate judgment consistent with this opinion.

     ENTERED at Manchester, New Hampshire.


Dated: February 18, 2016          <u>/s/ J. Michael Deasy</u>
                                    J. Michael Deasy
                                    Bankruptcy Judge